UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOSEPH A. MULLIGAN,
        Plaintiff,

v.                                                          3:14-cv-01793-WWE

DEPARTMENT OF DEVELOPMENTAL SERVICES,
State of Connecticut,
        Defendant.

**MEMORANDUM OF DECISION
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Joseph Mulligan alleges disparate treatment and hostile work environment discrimination based on his gender, and retaliation based on his complaints of discrimination. Defendant Department of Developmental Services ("DDS") has moved for summary judgment on all three counts.  For the following reasons, defendant's motion will be granted.

**BACKGROUND**

The following information was gleaned from the parties' statements of fact, affidavits, deposition transcripts, and other exhibit documentation.

Plaintiff began working for defendant in 2004.  He was an office assistant whose duties consisted of filing, copying, answering calls, and various other clerical tasks.  The terms and conditions of plaintiff's employment are controlled by a collective bargaining agreement.  As of 2004, all of defendant's employees were required to undergo sexual harassment prevention and diversity training.

Multiple of plaintiff's work performance reviews state that he would occasionally wander off and needed to focus on staying in his work area.  The reviews also noted some attendance problems.  Nevertheless, plaintiff was able to maintain a large volume of work.

On January 12, 2006, plaintiff received a letter regarding alleged inappropriate behavior, which provided that plaintiff had made inappropriate comments of a sexual nature to one of defendant's consumers.  The letter provided:

> The DMR work rules clearly state that "employee behavior, conduct and language shall provide a good example for consumers….Any behavior that endangers the safety and welfare of consumers or employees…inappropriate teasing or horseplay is prohibited. Direct or implied threats, even those made in a joking manner, are prohibited."

> Your supervisor and manager have spoken to you on two earlier occasions about inappropriate conduct and language in the workplace.

> By way of this letter I am ordering you to cease and desist from any future such actions towards any of our consumers. This kind of behavior will not be tolerated. Any future acts of this kind will result in serious disciplinary follow up.

On August 24, 2009, plaintiff was suspended without pay for violating DDS work rule #20, which prohibits accessing the internet for personal use during work hours using State equipment.

Plaintiff alleges only a single similarly situated comparator, a female office assistant, whom plaintiff had often criticized.  Plaintiff asserted that the office assistant was angry and hostile over his criticism of her work, resulting in her behaving unprofessionally and creating a scene.

On February 22, 2012, plaintiff filed a written complaint against the female office assistant.  Plaintiff asserts that he was on break when the female office assistant charged at him and took a swing at him.  Plaintiff did not return to work until February 27, 2012, where he learned that the female office assistant had been involuntarily transferred to different office in another town.  Defendant also suspended her without pay as a result of her conduct toward plaintiff.

The female office assistant eventually returned to work at plaintiff's office in June 2012, but defendant restructured plaintiff's job duties to eliminate his need for interaction with her. Moreover, the female office assistant was relocated to a different area of the office in an effort to limit her contact with plaintiff.

Both the female office assistant and plaintiff were represented by their union as part of their respective disciplinary hearings. The female office assistant and plaintiff did not share a similar disciplinary history, and plaintiff, unlike she, refused to agree to the compromised discipline imposed by defendant.

Plaintiff could not name a similarly situated female co-worker who received less severe discipline than he did for the period of February 2013 to November 2014.

After receiving numerous written complaints from plaintiff's co-workers about plaintiff's concerning behavior, defendant investigated those claims, including a complaint from a co-worker, for violations of defendant's sexual harassment policy and DDS work rule #3, which concerns inappropriate conduct toward DDS clients.

On May 22, 2012, a female co-worker filed a sexual harassment complaint against plaintiff. Plaintiff did not learn of the complaint until June 12, 2012, when he was notified of an upcoming meeting with Ms. Reid, an EEO investigator, and a union representative. Defendant took statements from seven non-management employees as part of its investigation and concluded that these third parties described plaintiff's workplace behavior similarly.

These co-workers told defendant that plaintiff sometimes visited female employees at their homes unannounced, uninvited, and going as far as being physically present in their homes without their knowledge. These co-workers described feeling uneasy, anxious, and uncomfortable around plaintiff.

One of plaintiff's co-workers complained to defendant that plaintiff told her disturbing information about another co-worker's sexual history, mental health, and drug use; and that plaintiff cursed at her when she told plaintiff to stop disclosing such information.

Some of plaintiff's co-workers told defendant that plaintiff used inappropriate language such as, "fucking," "vagina," "talking shit," and excused himself by stating that his language constituted "slips."

Some co-workers told defendant that plaintiff is unstable and disrupts other employees at their desks.  These co-workers told defendant that plaintiff is unpredictable, chatty one day and quiet another.  Most of these co-workers told defendant that they were afraid of retaliation from plaintiff, who had stated that he could take people down.  Some co-workers indicated that they were afraid of plaintiff's erratic behavior, using language such as, "He could go off the deep end," or, "He could flip."

One June 22, 2012, defendant's Equal Employment Opportunity department interviewed plaintiff about the allegations of sexual harassment and threatening brought against him by co-workers.  Plaintiff was accompanied by a union representative.

On July 12, 2012, plaintiff received a letter from Ms. Reid, which reported her findings and concluded that plaintiff had engaged in sexual harassment.  Reid recommended that plaintiff take sexual harassment training as a remedy.

On July 18, 2012, defendant notified plaintiff that he would have a pre-disciplinary *Loudermill* hearing on August 1, 2012.  Following the hearing, defendant placed plaintiff on paid administrative leave pending a fitness for duty evaluation while defendant further investigated claims of plaintiff's improper behavior toward his female co-workers.  Plaintiff was on paid administrative leave from August 1, 2012, until February 8, 2013.  He returned to work on

February 13, 2013.  Plaintiff did not suffer any loss of pay or benefits while on paid administrative leave.

Plaintiff swore that defendant viewed him as mentally disabled based upon his co-workers' complaints.  State regulations permit an agency to request a fitness for duty examination of an employee.  Both male and female employees of defendant have undergone fitness for duty examinations at defendant's request.

In September 2012, plaintiff started treating with his own personal psychologist, Dr. Mann.

On September 4, 2012, Dr. Catherine Lewis, a psychiatrist, conducted the fitness for duty examination of plaintiff at defendant's request.

On October 19, 2012, at the recommendation of Dr. Lewis, plaintiff underwent an examination by neuropsychologist Dr. Richard F. Kaplan.

On January 2, 2013, Dr. Lewis opined that the Plaintiff was not fit for duty as an Office Assistant for defendant.

Dr. Lewis's report to defendant concerning plaintiff noted:

- "His affect (i.e. external expression of internal emotional state) was of high intensity, wide range, and at times not appropriate to the conversation."

- "He cried multiple times during the interview when discussing his family and long past events (i.e. his mother's death when he was age ten)."

- "His crying rose to the level of sobbing several times during the interview.  He would then rapidly stop and return to a bright and cheerful affect for no clear reason."

- "Mr. Mulligan's thought processes were characterized by perseveration (i.e., saying the same thing and returning to the same topic), tangentiality (i.e., straying from the topic at

hand), and at times, loosening of associations (i.e., talking about unrelated things when asked questions)."

- "He was paranoid with respect to his co-workers being out to get him with false claims related to his workplace behavior."

- "He launched into a lengthy explanation of growing up in Bloomfield and how that offered him unique insight into 'black people' and how other people resented his 'acting black.'"

Plaintiff told Dr. Lewis that "people have difficulty with him because he speaks his mind. He then went on to say that, "It's the Irish way, very Irish.  My father raised me Irish."

Dr. Lewis's report to defendant noted that plaintiff told Dr. Lewis that "Christmas is about Christ.  Thanksgiving we should really call massacre day and say happy massacre day because 'where are all the Indians?  Halloween is a good thing.'"

Dr. Lewis noted that at the end of the interview she asked plaintiff if he had anything to add that she may have not asked.  Plaintiff "began to cry and said he had told me things he wished he never said."  Dr. Lewis's report concluded that, "His insight was very limited and his judgment fair."

Dr. Lewis's report to defendant concerning plaintiff's fitness for duty opines: "It is my opinion, based on the evidence available to me at this time, that Mr. Mulligan is not fit for duty as office assistant in DDS.  His thought processes are disorganized and result in him making bizarre statements.  His affect is rapidly shifting with episodes of laughing loudly or sobbing interspersed.  This behavior has been documented in his workplace and was seen by myself and

the neuropsychologist who evaluated him."  The report also concluded that, "He has psychotic thinking as evidenced by disorganization, grandiosity, and paranoia."

On January 7, 2013, plaintiff was provided Dr. Lewis' report.

On February 7, 2013, plaintiff started treating with a psychiatrist, Dr. Eddy.  This was not based on a referral from Dr. Mann.  Plaintiff was treating with both a psychologist and a psychiatrist monthly, but he maintains that there is nothing wrong with him.

On February 7, 2013, plaintiff produced a medical certificate from Dr. Mann, which stated that the plaintiff could return to work provided he had ongoing mental health treatment. That same day, the law firm representing plaintiff at that time sent an email to defendant, appending a report from Dr. Mann.  That report certified that plaintiff was fit for duty "with continued treatment."

Defendant agreed to return plaintiff to work provided he continue psychological treatment.

On February 8, 2013, plaintiff was able to return to work, and his actual first day at defendant since August 1, 2012, was February 13, 2013.

On February 15, 2013, plaintiff was placed on paid administrative leave while defendant and his union negotiated discipline for plaintiff's July 2012 substantiated violation of the DDS Sexual Harassment Policy and the DDS Work Rule #3.

On February 22, 2013, plaintiff and his union representative, Tom Sellas, met with Human Resources to discuss appropriate discipline.

The union reached a compromise agreement to resolve plaintiff's issues with defendant. The agreement provided that plaintiff would have no suspension.  The union told plaintiff to accept the compromise offered by defendant, that he would suffer no discipline but would

withdraw his grievances and complaints.  Plaintiff refused to execute the agreement and, instead, served a ten day suspension.

On March 1, 2013, plaintiff was notified that from March 8 to March 21, 2013, he would serve a ten-day suspension without pay for violation of the DDS Sexual Harassment Policy and the DDS Work Rule #3.  This letter was issued after plaintiff rejected the stipulated agreement recommended by his union that would have resulted in no suspension.

The State of Connecticut's Office of Policy and Management's Office of Labor Relations addressed the plaintiff's grievance regarding his ten-day suspension in a decision issued on October 22, 2013.  That decision stated in part, "The variety of statements from female coworkers of the Grievant support a finding that the Grievant violated the cited Policy and Work Rules.  In light of the seriousness of the charges and the lack of any evidence that the Agency treated the Grievant disparately, the [ten-day] suspension was warranted."

On March 13, 2013, plaintiff was notified that in accordance with the collective bargaining agreement, he was being transferred in his current position to an assignment in the IFS Division in DDS' Willimantic office.

Plaintiff testified that he was transferred to the Willimantic office because he refused to sign the compromise agreement.

Plaintiff alleged that, since February 2013, he was subjected to disparate treatment in the form of higher scrutiny, more severe discipline for similar misconduct, material changes in the location of his work environment, being forced to submit to multiple Fitness for Duty examinations, and being given more severe discipline than that received by similarly situated co-workers who received discipline.

Plaintiff admitted that all state employees are required to be fit for duty.  Plaintiff contends that the fitness for duty examinations were inappropriate because his accusers were not truthful.  Plaintiff asked his union to file a grievance concerning his fitness for duty examination, and the union refused to do so.

Plaintiff's own psychologist, Dr. Mann, said that he required continued mental health treatment to be fit for duty as an Office Assistant.

Plaintiff alleges that DDS's investigation of claims of sexual harassment of a DDS client by him in 2006 are part of a hostile work environment.  After being investigated for his sexual harassment of a DDS client in 2006, plaintiff complained to DDS's Affirmative Action Unit's Rita Kelley that he had been falsely accused.

Starting in 2006, plaintiff has complained to his union about treatment at work. However, plaintiff was not able to recall any specific incidents in 2007, 2008, 2009 or 2010.

Plaintiff had been instructed by defendant that if he had a problem at work he should report it.

Plaintiff testified that he complained to management that his DDS co-workers harassed him, but he did not say he was claiming harassment based upon his gender.  Nevertheless, plaintiff asserts that he was harassed almost daily by his female co-workers, who used obscene language and called him "wimp," and "woman," and "crybaby."  Plaintiff testified to dozens of incidents of co-workers exhibiting rude behavior toward him.

A review of defendant's records from 2006 to 2014 demonstrates that plaintiff did not file any complaints to DDS's Affirmative Action/Equal Employment unit; that plaintiff did not file any complaints to DDS's Human Resources department about mistreatment based upon his gender excepting the grievance challenging his ten-day suspension and transfer.

Plaintiff filed complaints with the Commission on Human Rights and Opportunities and the EEOC on June 21, 2012, and January 28, 2013.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

Plaintiff's discrimination and retaliation claims are governed by the familiar *McDonnell Douglas* burden-shifting framework. See Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 70, 73-74 (2d Cir. 2015); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). For his discrimination claim, plaintiff must present a *prima facie* case by demonstrating (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3)

10

that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. See Tolbert v. Smith, 790 F.3d 427, 435 (2d Cir. 2015). For his retaliation claim, plaintiff must present a *prima facie* case by showing (1) that he participated in a protected activity known to defendant; (2) that defendant took an employment action disadvantaging him; and (3) that there exists a causal connection between the protected activity and the adverse action. See Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 257 (2d Cir. 2014).

If plaintiff succeeds in making this *prima facie* showing, then "the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." Aulicino v. New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009). If defendant meets that burden, plaintiff in turn must prove that the employer's stated reason was a pretext for discrimination or retaliation. See Abrams, 764 F.3d at 254.

In the context of the discrimination claim, plaintiff can only meet his burden if he shows both that the employer's stated reason is untrue or incomplete, and that gender was a motivating factor for the adverse action. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000); Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 157 (2d Cir. 2010). For the retaliation claim, plaintiff must show that the action would not have occurred but for a retaliatory motive. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533-34 (2013); Ya-Chen Chen, 805 F.3d at 70.

**Hostile Work Environment**

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993).

Defendant disputes that hostility in plaintiff's work environment was sufficiently severe or pervasive to create a hostile working environment proscribed by Title VII.  The Court agrees.

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.  Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.  We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view.

 Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Moreover, a hostile work environment claim requires proof that the hostility occurred because of the plaintiff's protected characteristic.  See Rivera v. Rochester Genesee Regional Transp. Authority, 743 F.3d 11, 20 (2d Cir. 2012).  So, here, plaintiff must be able to demonstrate that abusive treatment was based on his gender.

Plaintiff's circumstantial evidence that he was targeted because of his gender begins and ends with the fact that (1) he was the only male office assistant in his department, and (2) his female co-workers called him names, such as, "baby," "crybaby," "wimp," "woman," and "butthead."  Although these names may be arguably related to gender, the connection is not strong.  Neither plaintiff's status as the sole male in his department nor the names he was called indicate that plaintiff was targeted because of his membership in a protected class.  Plaintiff did not get along well with his co-workers and may have been mistreated by them, but considering the totality of the circumstances, no reasonable jury could find that disharmony, in itself, to be evidence of an attack on plaintiff's gender.  Plaintiff has failed to adduce sufficient evidence that

he was targeted *because of his sex*.  See <u>Rivera</u>, 743 F.3d at 23.[1]  Accordingly, summary

judgment will be granted as to plaintiff's hostile work environment claim.

**Disparate Treatment**

Defendant has provided legitimate bases for the disciplinary actions it took against

plaintiff.  Plaintiff has not demonstrated that defendant's actions were pretext or that defendant

was motivated by plaintiff's gender.  Moreover, plaintiff has failed to address defendant's

motion for summary judgment as to this claim.  Accordingly, summary judgment will be granted

in favor of defendant as to plaintiff's disparate treatment claim.

**Retaliation**

Plaintiff also fails to address defendant's motion for summary judgment as to his

retaliation claim.  Plaintiff has failed to demonstrate a causal connection between protected

activity and adverse action by defendant.  Accordingly, summary judgment will be granted in

favor of defendant as to plaintiff's retaliation claim.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.  The

Clerk is instructed to close this case.

Dated this 20th day of March, 2017, at Bridgeport, Connecticut.


_____/s/Warren W. Eginton_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE

---

[1] "Here, there was (barely) enough evidence—both the use of ethnic slurs and the broader bullying and physical harassment—from which a reasonable jury could find that Folino harassed Rivera not merely because of their personal history, but also because Rivera was Puerto Rican."